# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### GREENEVILLE

UNITED TELEPHONE SOUTHEAST, LLC d/b/a ) 
CENTURYLINK, )
                                    )
            Plaintiff, )   No. 2:14-cv-242
                                    )
vs. )
                                      )
BRISTOL TENNESSEE ESSENTIAL SERVICES, )
                                    )
            Defendant. )

---

## COMPLAINT

Plaintiff United Telephone Southeast, LLC d/b/a CenturyLink, for its Complaint against Defendant Bristol Tennessee Essential Services, states as follows:

## I.    <u>PARTIES.</u>

1.    Plaintiff United Telephone Southeast, LLC d/b/a CenturyLink ("CenturyLink") is a Virginia limited liability company with its principal place of business at 100 CenturyLink Drive, Monroe, Louisiana 71203. Its sole member is Embarq Corporation, a Delaware corporation with its principal place of business at 100 CenturyLink Drive, Monroe, Louisiana 71203. CenturyLink provides telecommunications services to customers in several states, including the Bristol, Tennessee area.

2.    Defendant Bristol Tennessee Essential Services is a Tennessee municipal electric utility created and governed by the Tennessee Municipal Electric Plant Law of 1935, Tenn. Code Ann. § 7-52-101 *et seq.* BTES' principal place of business is 2470 Volunteer Parkway, Bristol, Tennessee 37621. Since 2006, BTES has provided telecommunications services in the Bristol, Tennessee area in competition with CenturyLink.

## II.    JURISDICTION AND VENUE.

3.    Jurisdiction is present under 28 U.S.C. § 1332, diversity of citizenship.  Plaintiff CenturyLink is a citizen of Virginia and Delaware.  Defendant BTES is a citizen of Tennessee. The amount in controversy exceeds $75,000.

4.    Venue is proper because CenturyLink's claims arose in the Eastern District of Tennessee.

## III.    FACTUAL BACKGROUND.

5.    CenturyLink brings this action to recover for BTES' unlawful use of CenturyLink facilities and equipment.

6.    As required by federal law, CenturyLink allows competitors to lease various discrete components of CenturyLink's own network infrastructure.  *See* 47 U.S.C. § 251(c)(3). These discrete components (*e.g.,* copper lines, fiber optic transport, call-related databases) are referred to as unbundled network elements.  *See* 47 C.F.R. § 51.5.

7.    CenturyLink leases these unbundled network elements to competitors in exchange for:  (1) a monthly fee (the "monthly recurring charge") and; (2) a one-time fee (the "non-recurring charge") to cover the administrative costs of processing each network element order. *See* 47 C.F.R. § 51.503.   The monthly recurring charge is calculated pursuant to Federal Communications Commission ("FCC") methodology based on CenturyLink's costs.  This FCC cost-based rate is referred to as the TELRIC rate ("Total Element Long Run Incremental Cost"). *See* 47 C.F.R. § 51.505.

2

**A.** ***BTES' Unlawful Use of CenturyLink NIDs.***

8.      One  type of unbundled network element available for lease is a network interface device, or "NID."  *See* 47 C.F.R. § 51.319(c).  For residential customers, the NID is typically a grey plastic or metal box located on an exterior wall of the customer's premise.  The NID is the property of CenturyLink.  The NID houses the connection between CenturyLink's network and the customer's inside telephone wires.  A photo example of a Bristol-area CenturyLink NID is below.



Picture 1 -- CenturyLink NID Massengill Road

9.     The NID provides the grounding point for the CenturyLink network connection. The NID also protects the otherwise exposed wire connections from weather, water damage, animals and insects, and inadvertent contact. The NID also houses the network testing point.

10.     CenturyLink's TELRIC stand-alone rate for the monthly recurring charge competitors must pay to use a CenturyLink NID in Tennessee is $2.11 per month. The non-recurring charge is $3.06 per NID order.

11.     BTES has never placed an order or other request to use a CenturyLink NID.

12.     CenturyLink has never given BTES permission or authority to use CenturyLink NIDs.

13.     BTES has never made any payment to CenturyLink for use of CenturyLink NIDs.

14.     Nonetheless, as part of its method for serving customers at a location where a CenturyLink NID is present, BTES technicians, contractors, or agents have routinely used the CenturyLink NID as a convenient, weather-protected box to house BTES' connection to the customer's inside wire.

15.     Prior to November 2013, BTES routinely installed its wires inside CenturyLink NIDs.

16.     CenturyLink first learned of BTES' use of CenturyLink NIDs around March 2013.

17.     On or about March 27, 2013, CenturyLink sent a letter to BTES Chief Executive Officer R. Mike Browder and BTES counsel C. Thomas Davenport notifying BTES that CenturyLink had recently learned BTES was improperly accessing and utilizing CenturyLink's NIDs in Tennessee. CenturyLink asked BTES to immediately cease using CenturyLink NIDs. CenturyLink's letter also stated that "BTES has damaged CenturyLink's NIDs and has violated

4

applicable industry safety standards, creating potential safety issues." CenturyLink asked to schedule a conference call with appropriate personnel from both parties within 30 days. A copy of CenturyLink's March 27, 2013 letter is attached as Exhibit 1.

18. BTES responded on or about April 4, 2013. BTES denied any knowledge of use of or damage to CenturyLink NIDs. BTES declined to participate in the requested conference call and requested additional information. A copy of BTES' April 4, 2013 letter is attached as Exhibit 2.

19. CenturyLink replied on or about May 14, 2013. In response to BTES' request for additional information, CenturyLink attached a photograph showing BTES' wire connected inside a CenturyLink NID. The letter offered to "address other examples of NID damage/compromise during a conference call or a face-to-face meeting between our respective technicians and other company personnel." The letter repeated CenturyLink's request for a conference call to discuss the issue:

> Our purpose in requesting a conference call was to discuss these concerns in order to seek informal resolution of this matter on a going-forward basis -- *i.e.*, rather than formal litigation. Thus, the statement in your correspondence that a conference call would be pointless is quite intriguing. It remains CenturyLink's request that knowledgeable persons and technicians for each company attempt to discuss and to develop solutions concerning on-going use of and damage to CenturyLink NIDs by BTES employees or independent contractors.

A copy of CenturyLink's May 14, 2013 letter is attached as Exhibit 3.

20. BTES replied on or about June 5, 2013. BTES stated that the photograph of BTES connections inside a CenturyLink NID had been circulated to BTES management and technical personnel, but "quite frankly none of them are able to make any sense out of this picture in the context of your letter." BTES again declined to participate in a conference call, stating instead that "you need to have your technical people that have knowledge of the problems

5

(and the locations where they occurred) call or make arrangements to visit Kenneth King, BTES Director of Operations and Safety." A copy of BTES' June 5, 2013 letter is attached as Exhibit 4.

21. As BTES directed, CenturyLink arranged to meet with Mr. King in Bristol on July 24, 2013. Because BTES claimed in its letters not to understand the improper NID use and damage CenturyLink was referring to, CenturyLink suggested the parties jointly visit a number of BTES connection sites to see the problems in person. To demonstrate examples of the type of problems CenturyLink had become aware of, CenturyLink prepared a site visit list of approximately 29 sample customer locations. CenturyLink selected the sample visit sites by choosing a recent month at random and identifying BTES' telephone number porting requests to CenturyLink for that month. These porting requests indicate customers transferring their service from CenturyLink to BTES. CenturyLink selected 29 of those customer addresses and provided this sample visit list to BTES at the July 24, 2013 meeting.

22. On July 24, 2013, after a brief introductory meeting, CenturyLink and BTES personnel began joint visits to the 29 sample addresses, working their way through the list based on location. BTES personnel chose to accompany CenturyLink on the morning visits to approximately the first 5 locations before leaving to attend to other duties. After the BTES personnel departed, CenturyLink personnel continued working through the list, ultimately visiting 12 locations that day before the CenturyLink representatives had to resume other duties.

23. The July 24, 2013 site visits confirmed that BTES was using CenturyLink NIDs when connecting BTES customers.

24. BTES had connected its wire inside CenturyLink's NID at 11 of the 12 locations visited on July 24, 2013. The 12th location was a business where no external NID was present.

6

25.    Instead of removing the customer's inside telephone wire from CenturyLink's NID and installing it in BTES' own NID or other box device, BTES installed its network wire directly into CenturyLink's NID.    Below is a photo from a July 24, 2013 site visit to demonstrate.    Additional July 24, 2013 site visit photos are attached as Exhibits 5 through 13.



Picture 2 -- Sells Road

7

26. At some locations, BTES disconnected CenturyLink's network by unplugging CenturyLink's RJ11 telephone jacks and leaving them hanging loose inside the NID. BTES' wire was then connected to the customer's inside wire using the CenturyLink NID lugs. Below is a photo from the July 24, 2013 site visit to demonstrate.



Picture 3 -- Sells Road

27.     Unplugging CenturyLink's RJ11 jacks and leaving them hanging exposes the wiring on the jack and in the test port to damage from such things as moisture, debris, and insects.

28.     Such exposure can corrode or damage telephone wiring, causing the wiring to fail or short, which is also a safety hazard.

29.     At one location visited on July 24, 2013, the BTES installer had cut the ground wire to CenturyLink's NID, leaving the NID ungrounded.  See photo below.



Picture 4 -- Massengill Road

30.     An ungrounded NID poses a safety hazard.  It also exposes the network to damage from a lightning strike or electric surge.

### B.     BTES' Unlawful Use of CenturyLink Subloops.

31.     A subloop is another type of unbundled network element CenturyLink leases to competitors.   A subloop is a portion of CenturyLink's distribution network that acts as a transmission facility between the customer's premises and any feasible access point on CenturyLink's network, such as a utility pole, pedestal, or remote terminal.   Subloops are the property of CenturyLink.   Subloops are often buried underground.

32.     CenturyLink's TELRIC rate for the monthly recurring charge competitors must pay to lease a Tennessee subloop ranges from $13.66 per month to $33.14 per month, depending on the type of wire and location.   Depending on location and type of wire, the non-recurring charge for Tennessee subloop leases ranges from $84.84 to $107.40 to connect the first line; from $29.84 to $52.04 to connect the second and each additional line; and $46.30 to disconnect each line.

33.     BTES has never placed an order or other request to use a CenturyLink subloop.

34.     CenturyLink has never given BTES permission or authority to use CenturyLink subloops.

35.     BTES has never made any payment to CenturyLink for use of CenturyLink subloops.

36.     BTES has used CenturyLink subloops when connecting some BTES telephone customers.

37. At one location visited on July 24, 2013, BTES had used a CenturyLink subloop by installing its wire in CenturyLink's dry spot box located on a utility pole. See photo below.



Picture 5 -- Pleasant Hill

38. By connecting BTES' wire to CenturyLink's subloop at the pole dry spot box, BTES was using CenturyLink's subloop buried wire connection to the house, as well as CenturyLink's ground wire.

39. BTES' connection to the CenturyLink dry spot box also left CenturyLink's network ungrounded, exposing CenturyLink's facilities to damage and posing a safety hazard.

11

### C.    Pre-Litigation Correspondence.

40.    Following the July 24, 2013 site visits, CenturyLink met with BTES in Bristol a second time around November 5, 2013.  At that meeting CenturyLink repeated its March 2013 request that BTES immediately cease using CenturyLink NIDs when connecting BTES customers.

41.    At the meeting CenturyLink asked BTES to either order and pay for all future NID use, or confirm it would promptly take steps to remove its facilities from all existing CenturyLink NIDs and correct any damage or other safety issues caused by BTES' past use.

42.    At the meeting CenturyLink also provided BTES with the Tennessee non-recurring and monthly recurring charge rates for use of CenturyLink NIDs.  CenturyLink asked BTES to search its records to identify all locations where BTES had used CenturyLink NIDs or other facilities.  CenturyLink notified BTES during the meeting that any resolution of the issue must include payments to CenturyLink to compensate for BTES' past use of CenturyLink's NIDs or other facilities.  BTES agreed to get back with CenturyLink after the meeting with BTES' response.

43.    BTES responded by letter dated November 20, 2013.  A copy is attached as Exhibit 14.   In that letter, BTES acknowledged that prior to CenturyLink's March 2013 notification, BTES' standard practice for some time had been to make its connections inside CenturyLink NIDs.  BTES stated that it ceased this practice effective November 6, 2013.  BTES stated in the future "the existing customer wiring will be removed completely from CenturyLink NIDs and rerouted to BTES NIDs."

44.    BTES' November 20, 2013 letter stated it had begun the process of removing BTES connections from CenturyLink NIDs by addressing the 29 sample locations on the list CenturyLink provided in July 2013.  However, despite CenturyLink's request, BTES did not

identify any other locations where it had used CenturyLink NIDs or other facilities, or even promise to take efforts to identify such locations in its records. Instead, BTES stated it would address any similar installations that were identified by CenturyLink. BTES did not respond to CenturyLink's request for compensation for BTES' past use of CenturyLink NIDs and other facilities.

45. CenturyLink replied to BTES' November 20, 2013 letter later the same day. A copy of CenturyLink's reply is attached as Exhibit 15. CenturyLink noted BTES' response did not contain a satisfactory resolution of BTES' past use of CenturyLink's NIDs. CenturyLink rejected BTES' attempt to shift the burden of identifying existing locations from BTES to CenturyLink, noting that only BTES would have knowledge of where it installed its facilities into CenturyLink NIDs.

46. CenturyLink's November 20, 2013 letter noted that based on telephone number porting requests and BTES' publicly-reported customer counts, it appears there are approximately 8,000 locations where BTES has connected customers since 2006 at a location where a CenturyLink NID would be present. Per BTES' acknowledged practice, BTES would have used CenturyLink's NID to house BTES' connections at those locations. CenturyLink stated it will need confirmation that BTES will undertake an expedited effort to address all 8,000 (approximate) locations. CenturyLink noted that "as part of such discussion, CenturyLink is willing to receive and discuss any BTES records information that would validate the exact number and location of BTES premises that need to be brought into compliance."

47. CenturyLink's November 20, 2013 letter also pointed out BTES had failed to respond to CenturyLink's request for payment for BTES' past use of CenturyLink NIDs. CenturyLink noted that it had provided BTES with the Tennessee rates for NID use. Applying

13

those rates to the approximately 8,000 locations since 2006 where it appears BTES used CenturyLink NIDs results in accrued NID use charges of more than $800,000.

48.     CenturyLink's letter asked BTES to respond to its requests for identification and removal of BTES facilities from CenturyLink NIDs and compensation for past NID use.

49.     BTES has not responded to CenturyLink's November 20, 2013 letter.

## COUNT I - BREACH OF CONTRACT.

50.     CenturyLink reincorporates and realleges all paragraphs of this Complaint.

51.     In April 2006, BTES entered into a contract with CenturyLink's predecessor United Telephone - Southeast, Inc. entitled *Interconnection, Collocation and Resale Agreement for the State of Tennessee Between Bristol Tennessee Essential Services and United Telephone - Southeast, Inc.* (referred to herein as the "ICA"). A copy of the ICA is attached as Exhibit 16.

52.     The parties entered into the ICA "to establish the rates, terms and conditions for local interconnection, collocation, local resale and the purchase of unbundled network elements for the state of Tennessee." *See* ICA (Exhibit 16) at p. 1.

53.     The ICA specifies that except as otherwise provided in the ICA, the agreement between the parties shall consist of the November 8, 2005 *Master Interconnection, Collocation and Resale Agreement for the State of Tennessee By and Between MountaiNet Telephone Company and United Telephone - Southeast, Inc.,* with BTES being substituted for MountaiNet Telephone Company and CenturyLink substituted for United Telephone - Southeast, Inc. ("Sprint"). *See* ICA (Exhibit 16) at p. 1.

54.     By its terms, the ICA expired on November 7, 2007. *See* ICA (Exhibit 16) at p. 2.

55.     At all times since November 7, 2007, BTES and CenturyLink have continued to operate as if the ICA were still in effect.

56.     Under Tennessee law, the parties are therefore operating under a new contract having the same terms and conditions as the ICA.

57.     At all times since November 7, 2007, BTES has continually had interconnection trunks with CenturyLink.

58.     At all times since November 7, 2007, BTES has continued to submit orders to CenturyLink for local number porting, directory listing, and directory services.  CenturyLink submits bills to BTES for these services pursuant to the rates and other terms of the ICA, and BTES pays these bills.

59.     Under the ICA, BTES is required to pay CenturyLink's non-recurring and monthly recurring charges for all unbundled network elements BTES uses.  *See* ICA (Exhibit 16) at p. 40 Sect. 39.1.

60.     A NID is an unbundled network element under the ICA.  *See* ICA (Exhibit 16) at pp. 42-43 Sect. 43; p. 9 Sect. 1.76.

61.     The ICA provides that when requested, CenturyLink will provide NIDs separately from loops for a separate price.  *See* ICA (Exhibit 16) at p. 43 Sect. 43.7.

62.     A subloop is an unbundled network element under the ICA.  *See* ICA (Exhibit 16) at pp. 51-53 Sect. 46; p. 9 Sect. 1.76.

63.     BTES' actions outlined herein, including without limitation, using CenturyLink's NIDs and subloops without ordering or paying for them and causing damage to CenturyLink's NIDs and subloops, constitute a breach of BTES' contractual obligations under the ICA.

64.     BTES' breach has caused CenturyLink damages in an amount to be proven at trial, but not less than $75,000.

## COUNT II - UNJUST ENRICHMENT.

65.     CenturyLink reincorporates and realleges all paragraphs of this Complaint.

66.     In the alternative, if the ICA is not operative, there is no existing enforceable contract between CenturyLink and BTES covering the subject matter of this Complaint.

67.     BTES has received valuable goods and services provided by CenturyLink, including, without limitation, the use of CenturyLink's NIDs and subloops.

68.     Under the circumstances, including, without limitation, the fact that both NIDs and subloops are unbundled network elements that must be paid for if used, under federal law, the ICA, and standard industry practice, BTES should have reasonably understood that CenturyLink expected to be compensated for BTES' use of CenturyLink NIDs and subloops.

69.     Under these circumstances, it would be unjust for BTES to retain those goods and services without payment to CenturyLink.

70.     BTES has been unjustly enriched as established by its use of valuable goods and services belonging to CenturyLink.  As a result of said unjust enrichment, BTES should be ordered to pay CenturyLink damages in an amount to be proven at trial, but not less than $75,000, plus costs and interest.

## COUNT III - CONVERSION.

71.     CenturyLink reincorporates and realleges all paragraphs of this Complaint.

72.     BTES appropriated CenturyLink's property, including, without limitation, CenturyLink NIDs and subloops, to BTES' own use and benefit by intentionally exercising dominion and control over the property, in defiance of CenturyLink's rights.

16

73.     BTES controlled or otherwise took possession of CenturyLink property, including, without limitation, CenturyLink NIDs and subloops, without CenturyLink's consent or other lawful authority.

74.     BTES' actions with respect to CenturyLink property, including, without limitation, CenturyLink NIDs and subloops, interfered and continues to interfere with CenturyLink's rights to possess and control the property.

75.     As a result of BTES' conversion of CenturyLink property, BTES should be ordered to pay CenturyLink damages in an amount to be proven at trial, but not less than $75,000, plus costs and interest.


## COUNT IV:  REQUEST FOR DECLARATORY JUDGMENT

76.     CenturyLink reincorporates and realleges all paragraphs of this Complaint.

77.     An actual, present, and justiciable controversy has arisen and now exists between CenturyLink and BTES concerning BTES' legal obligations regarding use of and payment for CenturyLink facilities, including, without limitation, CenturyLink NIDs and subloops.

78.     CenturyLink contends, and BTES disputes, that at all times, the law imposed upon and continues to impose upon BTES the obligation to obtain CenturyLink's permission and pay all non-recurring and monthly recurring charges for BTES' use of any CenturyLink property or facility, including, without limitation, CenturyLink NIDs and subloops.

79.     A judicial declaration regarding these issues is necessary and appropriate so that CenturyLink may effectively enforce its rights under the law.

80.     For these reasons, CenturyLink prays that the Court issue a declaratory judgment expressly holding that at all times, the law imposed upon and continues to impose upon BTES the obligation to obtain CenturyLink's permission and pay all non-recurring and monthly

17

recurring charges for BTES' use of any CenturyLink property or facility, including, without limitation, CenturyLink NIDs and subloops.

## COUNT V:  REQUEST FOR PERMANENT INJUNCTION

81.     CenturyLink reincorporates and realleges all paragraphs of this Complaint.

82.     BTES is obligated by law to obtain CenturyLink's permission and pay all non-recurring and monthly recurring charges for BTES' use of any CenturyLink property or facility, including, without limitation, CenturyLink NIDs and subloops.

83.     BTES' failure to meet its legal obligations has and will continue to irreparably harm CenturyLink, including, without limitation, anti-competitive harm.

84.     CenturyLink does not have any other adequate legal remedy, as future enforcement of its rights would like require CenturyLink to file and litigate multiple actions.

85.     A permanent injunction, an equitable remedy, is warranted considering the balance of hardships between the parties.  BTES would suffer no legally cognizable harm from being required to meet its legal obligations with regard to use of CenturyLink's property or facilities.  Conversely, CenturyLink would be manifestly and actually harmed by BTES' failure to meet such legal obligations.

86.     The public interest, including the interest in a balanced competitive telecommunications market, would be served by the issuance of a permanent injunction.

87.     For these reasons, CenturyLink prays that the Court permanently enjoin BTES from failing to obtain CenturyLink's permission and pay all non-recurring and monthly recurring charges for BTES' use of any CenturyLink property or facility, including, without limitation, CenturyLink NIDs and subloops.

Case 2:14-cv-00242-JRG-MCLC   Document 1   Filed 08/07/14   Page 18 of 21   PageID #: 18

88.     This is CenturyLink's first application for extraordinary relief.

**WHEREFORE,** premises considered, CenturyLink respectfully requests the Court grant the following relief:

1.  That proper process issue and be served upon BTES requiring it to appear and answer this Complaint in the manner and time permitted by law;

2.  That judgment enter against BTES and in favor of CenturyLink in the amount to be determined at trial, together with all pre- and post- judgment interest accruing under applicable law;

3.  That the Court enter a declaration expressly holding that at all times, the law imposed upon and continues to impose upon BTES the obligation to obtain CenturyLink's permission and pay all non-recurring and monthly recurring charges for BTES' use of any CenturyLink property or facility, including, without limitation, CenturyLink NIDs and subloops;

4.  That the Court permanently enjoin BTES from failing to obtain CenturyLink's permission and pay all non-recurring and monthly recurring charges for BTES' use of any CenturyLink property or facility, including, without limitation, CenturyLink NIDs and subloops;

5.  That CenturyLink be awarded its costs of this action, including reasonable attorneys' fees;

6.  That a jury be empanelled to try all issues so triable by a jury; and

7.  That the Court award CenturyLink such other general and special relief to which it may be entitled, as the Court deems appropriate, and as justice and equity may require.

19

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**

By: ___s/Misty Smith Kelley___
         Misty Smith Kelley, BPR No. 019450

1800 Republic Centre, 633 Chestnut Street
Chattanooga, TN 37450-1800
(423) 209-4148
(423) 752-9549 (fax)
mkelley@bakerdonelson.com

*Attorneys for United Telephone Southeast,
LLC d/b/a CenturyLink*

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2014, I electronically filed the foregoing *Complaint* with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access the filing through the Court's electronic filing system.

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**

By: s/Misty Smith Kelley
_____
Misty Smith Kelley, BPR No. 019450

1800 Republic Centre
633 Chestnut Street
Chattanooga, TN  37450-1800
(423) 209-4148
(423) 752-9549 (fax)
mkelley@bakerdonelson.com
*Attorneys for United Telephone Southeast,
LLC d/b/a CenturyLink*